**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|   |   |   |
|---|---|---|
| | * | |
| KEVIN R. VESSELLS, | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO.  JKB-17-1516 |
| KAYDON RING AND SEAL, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Kevin R. Vessells brought this lawsuit against his former employer, Defendant Kaydon Ring and Seal ("Kaydon" or "Defendant") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606(a).   (Compl. ECF No. 1.)   Before the Court is Defendant's motion for summary judgment.  (ECF No. 26.)  The motion is fully briefed and ripe for review.  (*See* ECF Nos. 31, 35.)  There is no need to hold a hearing to resolve the matter.  *See* Local Rule 105.6.  There is no genuine dispute of material fact, and Defendant is entitled to summary judgment on all counts. Accordingly, the Court will grant Defendant's motion by accompanying order.

### I.    *Background*[1]

Plaintiff, an African American, began working for Kaydon in 1999, and in 2004 became a sealing rings operator.  (Dep. Kevin R. Vessells 24:11-12; 62:1-4, ECF No. 31-1 ("Vessells

---

[1] As this memorandum is reviewing a motion for summary judgment, the facts, and the inferences to be drawn from them, are taken in the light most favorable to the Plaintiff, who is the party opposing the motion.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

Dep.").)  In that position, Plaintiff would produce metal rings, generally for use in various engines, and often in aircraft.  (*See id.* at 38:15-39:4; Dep. Howard Sewell, Jr. 105:19-21, ECF No. 31-2 ("Sewell Dep.").)  Due to the ultimate use of these rings, it was necessary that they be produced in very specific measurements.  The customers would dictate the exact specifications of the rings they needed, with tolerances between half a tenth to a thousandth of an inch. (Vessells Dep 107:20.)  Because of this demanding precision, sealing rings operators, like Plaintiff, would be required to measure their product carefully using various tools, check their final products, and often have coworkers check their work as well.  (*See id.* 64:3-11; Sewell Dep. 21:15-21, 20:7-18.)  If the rings are the wrong size, they are generally unusable and become scrap metal, costing Defendant money.  (*See* Sewell Dep. 106:21-107, 108:10-17; Dep. Lynn Renee Hipp 10:9-19, ECF No. 31-3 ("Hipp Dep.").)  Rings may be scrapped for a variety of reasons—the metal used is more brittle and harder to work with, or becomes rusted—but if the ring is scrapped for an incorrect measurement, it is the fault of the operator.  (*See* Sewell Dep. 47:13-48:1, 28:17-29:5; Hipp Dep. 34:1-20.)  The operators are supposed to record the amount of scrap they produce.  (Dep. Charles Garafolo 14:7-11, ECF No. 31-4 ("Garafolo Dep.").)

Plaintiff was a member of a Union throughout his time at Kaydon.  (Vessells Dep. 35:14-17.)  According to the Union's Collective Bargaining Agreement ("CBA"), Plaintiff was entitled to a progressive disciplinary process, consisting of an oral warning, then a written warning, then a written warning with three days off (without pay), and then discharge.  (CBA § 17.1, ECF No. 31-6.)  If the "offender has five (5) years or more seniority with a good record, an additional step will be added before discharge, five days off without pay."  (*Id.*)

Plaintiff was disciplined for poor performance before he became a sealing rings operator. He was disciplined for defective work three times in 2001.  (*See* Vessells Dep. 108:21-109:4,

113:6-19; 115:4-6.)  In his year-end reviews in 2001 and 2004, it was noted that Plaintiff had problems with the quality of his work.  (*Id.* 117:3-21, 290:1-6.)  After becoming a sealing rings operator, he was disciplined in 2005 for producing incorrectly-sized rings, resulting in $3,667 worth of scrap, and quality issues were noted in his 2005 year-end review.  (*Id.* 120:21-122:3, 123:20-124:1.)  There is no evidence that Plaintiff was disciplined for work quality in the next seven years,[2] but Plaintiff was issued an oral warning for crashing a work vehicle in 2011.  (*Id.* 132:17-133:6.)

In 2014, Plaintiff made the first of what would be several complaints of discrimination. On February 21, 2014, Plaintiff made an anonymous hotline complaint, to report "harassing and racially discriminatory behavior."  (Alertline System Report for SKF-14-02-0007 at 2, ECF No. 31-8.)  Plaintiff stated that he observed his manager, Paul Butcher (a Caucasian man) use profanity when referring to Black employees, and that Mr. Butcher harassed Plaintiff and other employees.  (*Id.*)  Plaintiff also accused vice-president Jason Strommel and supervisor Tina Boyd of racist behavior.  (*Id.*)  After an internal investigation, the Director of Industrial Relations for Defendant's parent company determined that there was no evidence to support a claim of discrimination, but did confirm that Mr. Butcher used "inappropriate, profane and abusive language."  (*Id.* at 4.)

Plaintiff made a second hotline call on March 6, 2014.  (*See* Alertline System Report for SKF-14-02-0008 at 3, ECF No. 31-9.)  This time Plaintiff did not remain anonymous.  Plaintiff reported that "Paul tells Tina to only observe African American employees during the shift."  (*Id.* at 4.)  The investigation into Plaintiff's call concluded that the allegation was "unsubstantiated"

---

[2]  In 2013, Plaintiff's supervisor discovered that a number of rings Plaintiff had produced on a job were unacceptable, resulting in $1,178 in lost parts.  (Vessells Dep. 164:13-165:8.)  The supervisor gave Plaintiff an oral warning, but later withdrew it, as Plaintiff had only recently begun working on a different machine.  (*Id.*)

and that Ms. Boyd had been instructed to "watch all employees particularly those [who are] late, [who are] missing meetings or [who are] away from [the] work area." (*Id.*)

Two months later, on May 12, 2014, Plaintiff was disciplined for failure to follow instructions. (May 12 Warning, ECF No. 31-10.) The written description of this oral warning explained that Plaintiff had been instructed to run a specific job but had run a different job, and that "[Plaintiff] was given work instructions and disregarded them." (*Id.* at 2.) Plaintiff, in his declaration, refers to this as a "sham write-up," but does not explain further. (Decl. Kevin Vessells ¶ 4, ECF No. 31-11.) That is, he does not discuss whether he ran the right or wrong job, or whether something else about the warning was a "sham." Plaintiff presents no evidence that the issuer of this written warning (the signature appears to be that of Mr. Butcher) knew of Plaintiff's hotline complaints.

That summer, Plaintiff had two experiences that he views as instances of harassment. First, on or around June 2, 2014, Plaintiff saw a note in a break room which read "They train monkeys to pick/clean up after themselves . . . They shouldn't have to tell adults to do the same. Clean up after yourself Throw trash into Trash-CAN. d_ _ _ A _ _ _ _ ! [sic]." (Note, ECF No. 31-12; Decl. Kevin Vessells ¶ 5.) "[A] lot of the co-workers [at Kaydon] were very upset about this [note]." (Hipp. Dep. 22:19-21.) Second, in July 2014 Plaintiff complained to Human Resources about a hose that was tied up like a noose, which Plaintiff felt was intended to send a racist message. (*See* Vessells Dep. 183-184.)[3]

On August 20, 2014, Plaintiff applied for a promotion. (August 2014 Application, ECF No. 31-15.) In his application, Plaintiff conceded that he had "no experience at this position." (*Id.*) Plaintiff was interviewed for the position, but he was rated as below average for technical

---

[3] There is some dispute about whether the hose resembled a noose, whether it was hung that way to harass Plaintiff, or whether it was hung in the manner that hoses are generally hung in the facility.

skills and education/certification, and unsatisfactory for prior experience. (Vessells Dep. 223:17-224-17.) The position was ultimately given to a person with more seniority. (*See* August 2014 Application (noting that "An employee in the seniority was given the position.").)[4] Plaintiff does not dispute that he lacked experience, was rated below average for technical skills, or put forth evidence suggesting that he should have been rated higher for technical skills.

Plaintiff made a third hotline complaint on December 3, 2014. (Alertline System Report for SKF-14-02-0007, ECF No. 31-16.) Plaintiff stated that he had been retaliated against for making his initial February 21 complaint, stating "it just seems as if everything he[] does is nitpicked." (*Id.* at 2.) He stated that he had been falsely accused of speeding in the parking lot, and was written up for minor issues that had never been grounds for discipline in the past. (*Id.*) Plaintiff reported the noose incident from July, and an incident related to his paycheck that he believed stemmed from his complaints of discrimination.

On December 8, 2014, five days after Plaintiff made his third hotline call, Plaintiff was disciplined for "Failure to comply with Company policy." (Disciplinary Notice, ECF No. 31-17.) According to a notice of this infraction, Plaintiff failed to enter his work into the proper database. Under "Employee Comments," Plaintiff wrote, "I feel like [my supervisor] is signaling me out @ every change he gets [] I just want him to stop." (*Id.*) Plaintiff does not deny that he failed to enter his labor into the database, or that he violated company policy. Plaintiff does not provide any evidence that his supervisor was aware of the December 3 hotline complaint.

In January 2015, Michael Littleton, a production supervisor at Kaydon, sent an email to Howard Sewell, the operations leader at Kaydon, in which Mr. Littleton discussed Plaintiff. (*See* Vessells Dep. 259; Mot. Summ. J. Mem. Supp. 11, ECF No. 27 (providing date for email).)

---

[4] Plaintiff *alleges* in his complaint that the position was given to a less senior employee, but presents no evidence to support that allegation. (Compl. ¶ 21.) In Defendant's answer, Defendant stated that the person awarded the position had fewer years of service at the company, but more experience in the specific department.

According to this email, Mr. Littleton had spoken with Plaintiff, who "admitted to struggling with the job." (Vessells Dep. 259:11-12.) Mr. Littleton wrote that Plaintiff had requested a new micrometer and that he would "pursue that." (*Id.* 259:15-16.) When Plaintiff was asked if he remembered having "this conversation," Plaintiff responded "Yes, of course." (*Id.* 259:21.) It is unclear if he remembered having a conversation about his struggles at work, or a conversation about receiving a new micrometer.

In April 2015, Plaintiff requested a transfer to a different position but the request was denied. It is undisputed that he was denied the transfer because he applied too late. (*See* Dep. Tracey Rogers 87:14-88:21, ECF No. 31-7 ("Rogers Dep.").) In May 2015, Plaintiff applied for a promotion. It is undisputed that the position Plaintiff applied for was retracted. (Request for Promotion, ECF No. 31-19.) Plaintiff also admitted in his application that he had no experience in the position. (*Id.*)

Plaintiff took leave at the end of May 2015 and after returning to work, Plaintiff was given a written warning on June 25. (Vessells Dep. 383:15-18; Written Warning, ECF No. 31-20.) The warning stated that Plaintiff had produced incorrectly sized rings on three jobs, resulting in $5,382.35 worth of scrap material. (*Id.*) Plaintiff wrote on the warning that he did not "agree with this write up at all," but it remains unclear what aspects of it he actually disputes, if any.

A careful review of the evidence presented suggests that Plaintiff does not dispute the underlying facts set forth in this warning. The day after Plaintiff received this warning, he filed a grievance with his Union. (Grievance, ECF No. 31-21.) Plaintiff wrote: "I'm being singled out, harassed for work that is not unsellable these parts can be saved. I ran these 3 jobs before to specification but I was told before since they get Chrome on it to not scrap them just separate and

let go per: Charles Garafolo." (*Id.*) This grievance makes clear that Plaintiff felt at the time that he was being unfairly disciplined, but his grievance does not clearly refute the charges of the June 25 written warning. Perhaps by writing "I ran these 3 jobs *to specification*," Plaintiff meant that he ran them according to the instructions he was given, which would mean the written warning was baseless. But Plaintiff wrote he "was told . . . to not scrap them." This suggests that there was something wrong with the rings but that the defect did not matter (why would he have to be told not to scrap rings that were not defective?). Plaintiff does not argue in his opposition that any of the substance of the June 25 warning is incorrect. He does not argue that he performed the jobs correctly or that the cost of the errors was incorrect. He does not deny any of the substance of the warning in his declaration, does not appear to have denied them in his deposition,[5] and does not present the Court with any other evidence that this warning was substantively incorrect in any detail, aside from his handwritten note stating that he does not "agree with [it] at all." Ultimately then, it is undisputed that Plaintiff made incorrectly sized rings on those jobs and they had to be scrapped, although the significance of that error may be disputed (was it an error requiring discipline, or was Plaintiff "singled out" for a mistake that had no real consequence?).

The day after Plaintiff filed his grievance regarding the written warning, Plaintiff was issued a final warning with 3 days suspension. (Final Warning, ECF No. 31-22.) This warning stated that on June 24, 2015, Plaintiff performed a job and 100% of the product produced was unusable, resulting in $8,521 in scrap. (*Id.* at 2.) "Subsequent investigations" resulted in the discovery of another incorrectly run job. (*Id.*) "This [was] the 4th incident and total scrap amount [was] approximately $13903.25 [sic] . . . in the past month of unacceptable work

---

[5] Neither party has provided the Court with a portion of his deposition in which Plaintiff denies or admits the conduct for which he is accused in this warning.

quality." (*Id.*) Plaintiff does not dispute the substance of this warning. He does not present evidence that its issuer was aware of his grievance.

In early July 2015, Plaintiff again called the employee hotline to report harassment. (KF-2015-7-11-Discrimination or Harassment, ECF No. 31-23.) According to the report, Plaintiff named Charles Garafolo as his harasser, but did so only because Mr. Garafolo was the "person that signs his write ups." (*Id.*) According to the report, "[Plaintiff] stated that he was upset by the suspension [that accompanied his final warning] and that's why he called the hotline." (*Id.*) Plaintiff does not dispute that he said this in his hotline complaint.

On July 22, 2015, Plaintiff again requested a transfer and was again denied. (Transfer Request, ECF No. 31-24.) The reason stated was: "ineligible to bid due to disciplinary actions." (*Id.*) Plaintiff does not dispute that he was ineligible to bid due to disciplinary actions. The same day, July 22, Plaintiff's supervisors discussed in an email Plaintiff's low productivity: Plaintiff had worked on 131 pieces in a seven hour period, when he should have worked on 425 pieces in that time. (*See* Vessells Dep. 309:4-15.) Plaintiff does not dispute his low productivity. When asked about it in his deposition, he responded "[a]t th[at] point they [were] lucky I [was] still moving because I [was] so sick of what [was] happening to me." (*Id*. 309:14-15.)

On August 16, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on his race, disability,[6] and his participation in protected activities. (Charge of Discrimination, ECF No. 31-25.)

---

[6] Plaintiff has not brought a disability claim in this Court.

On September 17, 2015, Plaintiff was suspended for work quality. (*See* Suspension, ECF No. 31-26.)[7] According to the notice of the suspension, Plaintiff ran 39 pieces during a shift and 20 pieces "were found to be scrapped for low width . . . . a scrap rate of more than 50% [which] is unacceptable." (Suspension at 2.) Plaintiff alleged much about this job in his complaint. (*See* Compl. ¶¶ 48-54, 57-64.) For example, he alleged that the rings provided for the job (*i.e.*, the raw materials) were "defective," that his supervisor noted this problem in a "Job Operation Listing," that he screened out certain rings according to explicit instructions, that after he was confronted about the problems with the job he tried to present the notes from his supervisor but was "dismissed from the meeting." (*Id.*) But Plaintiff has presented the Court with no *evidence* to support any of these allegations.[8] So, from the Court's vantage point, it is undisputed that Plaintiff performed poor work resulting in over 50% of the product being scrapped on August 13, 2015. It is also undisputed that in the notice of suspension Plaintiff was warned that he "must comply with set procedures and policies for set up, operation, and inspection of his own work on side grind operation, necessary to ensure that defective parts are not generated and allowed to pass forward."

On December 16, 2015, Defendant fired Plaintiff. (Notice of Termination, ECF No. 31-29.) The termination notice stated that Plaintiff had incorrectly reported the amount of scrap generated on a particular job. He had reported only 2 scrap parts and 74 "good parts" but there were actually 46 scrap parts and only 43 "good parts," a scrap rate of over 50%. (*Id.*) Plaintiff

---

[7] Defendant argues that Plaintiff failed to follow instructions and erred on a job performed on August 11, 2015. (*See* Mot. Summ. J. Mem. Supp. at 14.) However, because Defendant only provided the Court with out-of-context pages from Plaintiff's deposition, the Court is unsure what the evidence actually says of this event.

[8] Defendant did not present evidence of this event at all. It asserted that Plaintiff was suspended from his job on September 17, 2015 in its memorandum in support of its motion, but cited to an incorrect section of Plaintiff's deposition, in which Plaintiff discusses a July 14, 2001 warning.

does not dispute that he generated that amount of scrap for that job, or that he reported a different amount of scrap.

Mr. Sewell was the manager who signed Plaintiff's termination. (*See id.* at 2.) Mr. Sewell was "the decision-maker with respect to [Plaintiff's] termination." (*See* Sewell Dep. 112:9-11.) Mr. Sewell was unaware of Plaintiff's previous complaints of discrimination when he made the decision to terminate Plaintiff. (*Id.* 112:12-21.) Plaintiff does not dispute that Mr. Sewell made the decision to terminate Plaintiff and does not dispute that Mr. Sewell was unaware of Plaintiff's prior complaints.

Six months after Plaintiff was terminated he was replaced by Yusef Scott, an African American. (Rogers Decl. ¶ 5, Def.'s Ex. L, *see* ECF No. 28.) Roughly two months later Mr. Scott was "terminated for job abandonment." (*Id.* ¶ 6.) Five months later, Mr. Scott's position (*i.e.*, Plaintiff's position) was filled by Mark Dauses. (*Id.* ¶ 7.) It appears that Mr. Dauses is a Caucasian male.[9]

During the course of discovery, Plaintiff obtained information regarding Defendant's workforce, including information on scrap production and disciplinary records. (*See* ECF Nos. 31-30 through 31-37; Opp'n 25-26, ECF No. 31.) According to Plaintiff's analysis, there were many "instances" when scrap was generated in certain quantities, .*e.g.*, over 2000 "instances" where more than 2% of the product was scrapped, and over 700 where more than 25% was scrapped. During the same time period, there were only "35 write-ups." (*Id.*) Plaintiff does not note which of these "instances" involved scrap generated due to the error of the operator, or scrap generation due to some other problem in the manufacturing process. In other words, it is

---

[9] In Ms. Rogers declaration she explained that Mr. Scott was an African American male, but provided no similar information about Mr. Dauses. In its memorandum in support of its motion for summary judgment, Plaintiff does not mention Mr. Dauses in the body of its argument, only noting that Plaintiff was replaced with an African American. In a footnote, Defendant notes that Mr. Dauses is Caucasian.

unclear whether the "instances" of scrap generation were "instances" that could have reasonably resulted in disciplinary action. It is therefore unclear what the impact of this data is.

Plaintiff also produced statistical evidence regarding the race of employees and the discipline they received. (*See* Opp'n at 27.) According to Plaintiff's analysis of this data, Black and White employees produced roughly the same amount of scrap in 2014 through 2015, but Black employees were disciplined more during the same period. (*Id.* at 27-28.) Again, Plaintiff does not note whether the scrap "produced" by the employees was produced as a result of operator error or another defect, and Plaintiff does not note whether the "write-ups" were for scrap-related errors or something else. The analysis seems to compare employees across many areas, *i.e.* not only sealing rings operators like Plaintiff. According to Defendant, Plaintiff's analysis includes various positions that do not actually "produce" scrap, such as supervisory positions, and it mistakes the race of several employees. (*See* Reply 9, ECF No. 35.)

Plaintiff received a notice of right to sue from the EEOC on March 6, 2017. On June 2, 2017, Plaintiff brought this lawsuit against Kaydon, alleging violations of Title VII, 42 U.S.C. § 1981, and the MFEPA. After the close of discovery, Defendant filed the instant motion on March 9, 2018, seeking summary judgment on all counts. That motion is fully briefed and ripe, and the Court will turn to the standard for such a motion, and its disposition.

## II.    *Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If

sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Still, the opposing party must present those facts; he cannot rest on his denials. He must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Furthermore, he must set forth more than a "mere . . . scintilla of evidence in support of [his] position." *Anderson*, 477 U.S. at 252.

**III.    *Analysis***

Plaintiff has brought six counts against Defendant: race discrimination under Title VII, Section 1981, and the MFEPA (three counts), and retaliation under the same statutes (3 counts). Plaintiff, unhelpfully, does not further describe which adverse employment actions constitute the grounds for these claims. As the Court sees it, Plaintiff has brought the following claims: (1) racially discriminatory termination, (2) racially discriminatory denial of transfers and promotions, (3) racially discriminatory discipline, (4) retaliatory termination, (5) retaliatory denials of transfers and promotions, (6) retaliatory discipline, and (7) hostile work environment. Although these claims are brought under three different statutes, they are analyzed under the same framework. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing Section 1981); *Finkle v. Howard Cty*, 640 F. App'x 245, 247 n.2 (4th Cir. 2016) (discussing MFEPA). The Court will begin with Plaintiff's race discrimination claims, then turn to Plaintiff's retaliation claims, and conclude with Plaintiff's hostile work environment claim.

## a. *Race Discrimination-Termination and Denial of Promotion*

Plaintiff has presented no direct evidence of race discrimination, and therefore the Court will analyze Plaintiff's claim according to the familiar burden-shifting framework that applies when a Plaintiff proceeds with circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10] Under that framework, for a plaintiff to prove that his termination or denial of promotion was an act of prohibited discrimination, the "[p]laintiff must first establish a *prima facie* case of discrimination, which requires establishing the following elements: (1) [he] is a member of a protected class; (2) [he] suffered adverse employment action; (3) [he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *James v. Verizon*, 792 F. Supp. 2d 861, 868 (D. Md. 2011) (internal quotation marks omitted). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to present a legitimate non-discriminatory reason for the adverse employment action. *Strothers v. City of Laurel, Md.*, 118 F. Supp. 3d 852, 862 (D. Md. 2015). The burden then shifts to the plaintiff to produce evidence that the proffered non-discriminatory reason is merely pretext for the true, intentionally discriminatory reason. *Bostron v. Apfel*, 104 F. Supp. 2d 548, 552 (D. Md. 2002).

---

[10] Plaintiff contends that he *has* presented direct evidence of discrimination, but he is mistaken. Evidence of "direct discrimination" is not, in the jargon of employment discrimination law, direct evidence of discrimination. The distinction centers on whether the plaintiff has direct proof that any adverse employment action was motivated by discriminatory animus, not whether the plaintiff has proof that he was directly discriminated against, or any "direct" proof of race-based harassment. *See Morgan v. SVT, LLC*, 724 F.3d 990, 995-96 (7th Cir. 2013) (discussing difference between the "direct method" of putting on proof and the "indirect method"). Plaintiff asserts that he has two pieces of "direct" evidence, the noose and the note; *i.e.*, that a hose was tied like a noose with, as Plaintiff contends, the intention to insult Plaintiff, and that a note was left in his breakroom referring to "monkeys." This may be evidence of racially motivated harassment, and they will be discussed when the Court considers Plaintiff's hostile work environment claim. If the Court knew the actors behind these events (who tied the noose, who left the note) this evidence could perhaps have circumstantial bearing on whether that actor acted with racially discriminatory animus when that actor, for example, disciplined or terminated Plaintiff. But these instances are not themselves adverse employment actions, and they are not direct evidence of discriminatory intent regarding any of the alleged adverse employment actions, such as Plaintiff's discipline and termination.

### i. *Prima Facie Case*

It is undisputed that Plaintiff satisfies the first two elements of the *McDonnell Douglas prima facie* case: he is an African-American who was terminated from his job. The Court's analysis of Plaintiff's claims will therefore focus on the third and fourth elements.

### 1. *Legitimate Job Expectations*

To meet his burden on the third element, Plaintiff must "demonstrate that he was qualified in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006) (internal quotation marks omitted). The purpose here is to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's [adverse employment action]," *Burdine*, 450 U.S. at 253, not to determine whether Plaintiff was a worthy employee. Furthermore, "[t]he self-perception of a plaintiff as to [his] qualifications . . . is irrelevant; what matters is the perception of the decision maker." *Chyu v. Md. Dep't of Health and Mental Hygiene*, 198 F. Supp. 2d 678, 683 (D. Md. 2002) (internal quotation marks omitted).

The Court cannot rule out that Plaintiff "was fired for inadequate job performance," *Warch*, 435 F.3d at 515, and cannot rule out that he was denied promotion in August 2014 because he lacked experience. According to Defendant, Plaintiff was fired for work quality, and because he had been disciplined for poor work quality, failed to follow instructions, and other infractions in line with the Union's progressive disciplinary process. As for Plaintiff's request for promotion he was denied because he lacked experience. For each disciplinary action and each written warning and suspension, Defendant justified its decision: Plaintiff produced too much scrap, failed to follow instructions, failed to comply with company policy, and so forth.

Plaintiff does not present evidence that calls those justifications into doubt. He produced no evidence refuting the amount of scrap produced, the cost of the scrap, that he failed to enter information into a particular database, or follow a particular instruction. Regarding Plaintiff's 2014 request for promotion, Plaintiff does not dispute that he lacked experience necessary for the position he applied to; *he wrote that he lacked experience on his application.* Plaintiff does not produce a scintilla of evidence suggesting "he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance." *Warch*, 435 F.3d at 515. Plaintiff's assessment of his own work and experience, that he was doing about as well as the rest of the employees at Kaydon, or that his lack of experience should not have mattered, is irrelevant. "[W]hat matters is the perception of the decision maker," *Chyu*, 198 F. Supp. 2d at 683, and Plaintiff has provided no evidence that the decisionmakers would have perceived in Plaintiff a qualified or experienced employee.

Plaintiff contends that even if he did not meet his employer's expectations, those expectations were not, in fact, "legitimate." A plaintiff may attempt to satisfy the third element of his *prima facie* case in this manner. *See Warch*, 435 F.3d at 517. Plaintiff here, however, presents no evidence suggesting the illegitimacy of his employer's expectations. First, to reiterate, Plaintiff's own assessment of his employer's expectations or his satisfaction of them is irrelevant. *Chyu*, 198 F. Supp. 2d at 683. Plaintiff's anecdotal evidence that other employees would regularly not meet these expectations is similarly irrelevant. *Cf. Featherstone v. United Parcel Service, Inc.*, 1994 WL 504804, at *3 (D. Md. Sept. 7, 1994) ("[Plaintiff]'s vague anecdotal accounts of other [employees'] conduct appear to reflect stories that he has heard about other [employees'] experiences rather than the specific facts that he must set forth to establish his prima facie case."). Second, Plaintiff's statistical evidence that purports to show discriminatory

application of discipline is not relevant to the question of whether his employer's expectations were illegitimate. Even if this evidence *did* show that other employees committed the same infractions as Plaintiff and were punished less (and it does not), that would not mean that Defendant's expectations of Plaintiff were "illegitimate."[11] To put it differently, Plaintiff argues that many people at Kaydon were bad at their jobs, not that Plaintiff was good at his. It is the latter that matters in determining whether Plaintiff met his employer's legitimate expectations. Generally, "statistical evidence has little, if any, relevance in an individual disparate treatment action," *Van Slyke v. Northrop Grumman Corp.*, 115 F. Supp. 2d 587, 597 (D. Md. 2000) (internal quotation marks omitted), and Plaintiff's statistical evidence has no relevance here. Plaintiff has failed to present evidence from which a reasonable jury could conclude that he satisfied the third element of his *prima facie* case.

### 2. *Similarly Situated Comparators*

To satisfy the fourth element of his *prima facie* case, a plaintiff may show that "the position remained open or was filled by similarly qualified applicants outside the protected class." *James*, 792 F. Supp. 2d at 868 (internal quotation marks omitted). However, "replacement within the protected class does not always give rise to an inference of non-discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005). If, for example, there was "a significant lapse of time . . . between the adverse employment action and the decision to hire another person," or if the decision to hire a person from within plaintiff's protected class was "calculated to disguise [an] act of discrimination," then a plaintiff's technical inability to meet the fourth element of *McDonnell Douglas* would not necessarily eliminate an inference of discrimination. *See id.* at 486 (citing *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998)). Still, if a plaintiff cannot show that the position remained open or that he was replaced by

---

[11] It *would* matter in a claim of discriminatory discipline, which the Court will briefly address below.

someone outside his protected class, and provides no evidence that undermines the sting of the inference of non-discrimination that results, summary judgment may be granted for the defendant. *See id.* (citing cases where the Fourth Circuit has "affirmed dismissals under prong four without even issuing published decisions"); *Williams v. Tero Tek Int'l., Inc.*, Civ. No. JKB-10-2672, 2012 WL 642428, at *6 (D. Md. Feb. 24, 2012) (granting summary judgment for defendant where plaintiff failed to provide evidence demonstrating fourth element).

Plaintiff has not presented evidence of a similarly situated comparator that suggests his termination was motivated by discriminatory animus, and therefore cannot establish the fourth element of his *prima facie* case. It is undisputed that Plaintiff was replaced by an African American male, Yusef Scott. Plaintiff argues that two additional facts undermine the inference of non-discrimination one could draw from Plaintiff's replacement by Mr. Scott: that the position remained open for six months, and that Mr. Scott himself was soon replaced by a White male. As for the length of time that the position remained open, Plaintiff appears to think that six months speaks for itself. It does not. Plaintiff states, without appeal to case law or Kaydon's hiring process, that six months is a "significant delay," especially considering that "Mr. Yusef Scott had been employed by Kaydon since at least 2013 and has performed [Plaintiff's job] before." (Opp'n at 29.) But there is no evidence regarding *when* Defendant sought to replace Plaintiff or how long that process ordinarily takes. Keeping a position open and facing productivity loss, only to fill it with a member of a plaintiff's protected class after it appears that the plaintiff is pursuing litigation is certainly suspicious. Keeping a plaintiff's position open for the amount of time that it normally takes to fill a position, or until someone capable applies is certainly not.

The Court has at least some sense of how long it normally takes to fill a position at Kaydon because Mr. Scott was replaced as well. Plaintiff argues that Scott's replacement *by* a White employee demonstrates that Scott's replacement *of* Plaintiff carries no force in this case. Plaintiff is wrong on two fronts. First, Scott was not fired in the traditional sense, he was "terminated for job abandonment." (Rogers Decl. ¶ 6.) Second, Mr. Scott was not replaced for five months. (*Id.* ¶ 7.) Thus, the fact that Mr. Scott was "terminated" does not appear to demonstrate some discriminatory animus, or suggest that his original appointment was intended to disguise such animus in Plaintiff's termination; it seems like Mr. Scott just stopped showing up for work. And, as was the case after Plaintiff was fired, it took about half-a-year to fill the position. Plaintiff has presented no evidence that he was replaced by a similarly situated comparator outside his class, or any evidence that would tend to compensate for that lack of presentation.

Insofar as Plaintiff relies again on his statistical evidence to demonstrate a similarly situated comparator, he is again mistaken. Plaintiff's exegesis of Defendant's labor reporting has not produced another employee who performed the same or similar work as Plaintiff, committed the same or similar infractions as Plaintiff, in quantity or quality, went through the same Union disciplinary process, and was not terminated. Plaintiff has presented evidence of other employees, many of whom perform other jobs, and who, it seems, generated scrap metal. But the Court is unaware if these employees generated scrap metal due to their own errors, if they generated scrap metal in the same manner or quantity as Plaintiff, if these employees performed jobs that naturally result in more or less scrap metal being generated (or any), and so forth. In short, "[i]nsufficient information exists about these other infractions to allow a reasonable trier of fact to determine that they were of comparable seriousness to the conduct for which [Defendant]

disciplined [Plaintiff]." *Featherstone*, 1994 WL 504804, at \*3. Accordingly, these comparisons carry no weight.

The Court will briefly note that Plaintiff fails to provide evidence of a similarly situated comparator with respect to his 2014 request for promotion as well. No evidence was presented as to whether the person who took the position was outside of Plaintiff's protected class, but neither was any evidence presented disputing that the person who took the position had more experience than Plaintiff. So, regardless of this person's race, he was not a similarly situated comparator. Plaintiff cannot carry his burden on the third or fourth elements of his *prima facie* case of racially discriminatory termination or denial of promotion (for the August 2014 denial), and, accordingly, summary judgment will be granted for Defendant on these claims.

### b. *Race Discrimination-Discipline*

It is not clear from the face of Plaintiff's complaint if he wished to assert a claim of discriminatory discipline, but Plaintiff appears to argue as if he has presented such a claim, and therefore the Court will briefly address it. In order to present a *prima facie* case of discriminatory discipline, plaintiffs must demonstrate that "(i) they are members of a protected class; (ii) the prohibited conduct in which they engaged was comparable in seriousness to misconduct of employees outside the protected class; and (iii) disciplinary measures enforced against them were more severe than those enforced against other employees." *Jenkins v. Baltimore City Fire Dep't*, 862 F. Supp. 2d 427, 452 (D. Md. 2012). Plaintiff has failed to present evidence in support of the second or third element.

To reiterate, Plaintiff's accumulated statistical evidence and occasional references to the unfairness of his discipline or the misconduct of his coworkers simply do not amount to evidence of other employees at Kaydon who engaged in "prohibited conduct . . . comparable in

seriousness" to his own, or who were disciplined less. In fact, some of the evidence presented by Plaintiff suggests that other employees who engaged in misconduct similar to the Plaintiff were punished similarly. (*See* ECF No. 31-33.) For example, numerous other employees were disciplined with oral warnings, written warnings, final warnings, and termination because they produced large amounts of scrap. (*See id.*) For another, one employee received a written warning for "not follow[ing] spec for right Job" on July 15, 2014. (*Id.* (6/30/14 entry for Mark Dorsey).) On May 12, 2014, Plaintiff received a written warning for a similar problem—failure to follow instructions. There is simply no evidence of other employees who engaged in similar misconduct but were disciplined less often or less harshly. Accordingly, Plaintiff cannot present a *prima facie* case of discriminatory discipline.

### c. *Retaliation-Termination and Discipline*

Plaintiff has failed to present direct evidence of discrimination with regard to his retaliation claim,[12] and therefore this claim proceeds under the *McDonnell Douglas* framework as well. Under that framework, the plaintiff must first "establish a prima facie case of retaliation, [by presenting] evidence that [he] engaged in protected activity, that [his] employer took an adverse employment action against [him], and that there was a causal connection between the two events." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). Plaintiff has presented undisputed evidence of the first two elements, that he engaged in protected activity (complaints to the company hotline or with the EEOC) and that adverse employment actions were taken against him. Plaintiff has failed to provide evidence in support of the third element.

A causal connection between protected activity and an adverse employment action can often be inferred from a close temporal connection between the two. *See Foster v. Univ. of Md.-*

---

[12] Unlike his race discrimination claim, Plaintiff makes no argument that he has presented direct evidence of retaliation.

*Eastern Shore*, 787 F.3d 243, 253 (4th Cir. 2015) ("[T]emporal proximity . . . *tends to show causation.*" (emphasis in the original)). There are some common-sense caveats to this type of evidence. First, the longer the time between the protected activity and the adverse action, the less force the inference has. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that "the temporal proximity must be very close" (internal quotation marks omitted)); *Anderson*, 281 F.3d at 458 (one day between complaint and adverse action was sufficient to establish causation); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (two-and-a-half month gap between protected activity and action was "sufficiently long so as to weaken significantly the inference of causation"); *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 590-91 (D. Md. 2009) (fourth month gap insufficient). Second, additional circumstances and intervening events can affect the strength of the inference. *See Miles.*, 429 F.3d at 491. If, for example, the decisionmaker was unaware of the protected activity, mere temporal proximity would not suggest retaliatory animus. *See Breeden*, 532 U.S. at 273 (noting that "there is no indication that [the decisionmaker] even knew about the right-to-sue letter when she proposed transferring [the employee]"). The plaintiff "must be able to show that the relevant [decisionmakers] were aware of his [protected activity] at the time the alleged retaliation occurred." *Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006); *see also Lewis v. Baltimore City Bd of Sch. Comm'rs*, 187 F. Supp. 3d 588, 596-97 (D. Md. 2016) (noting that "[t]he plaintiff has presented no evidence that the [decisionmaker] knew of her complaint").

At first glance, the timing in this case appears suspicious. Plaintiff notes that he went nearly eight years without any disciplinary infractions, only to begin receiving a steady stream of

warnings after he began complaining of discrimination.[13]  But upon closer inspection the causal connection between Plaintiff's complaints and any adverse employment actions disintegrates.

The timing between some of Plaintiff's complaints and various disciplinary actions is close, but not "very close."  *Breeden*, 532 U.S. at 273 (2001).  Plaintiff made two hotline complaints on February 21 and March 6, 2014, and then was disciplined on May 12, 2014.  Two months is long enough to weaken the inference.  *See King*, 328 F.3d at 151 n.5 (two-and-a-half month gap "weaken[ed] significantly the inference of causation").  Plaintiff complained of the noose in July 2014 and was denied a promotion in August 2014.  Plaintiff filed a charge of discrimination with the EEOC on August 16, 2015 and was suspended for work quality on September 17, 2015.  These one-month gaps are fairly close, but not so close as to overcome the weight of evidence that suggests these, and other temporally-related actions, were not retaliatory in nature.

Or, really, it is not close enough to overcome the *lack* of evidence:  Plaintiff fails to provide additional facts that are necessary to create an inference of discrimination arising from temporal proximity, even when that temporal proximity *is* "very close."  For example, one day passed after Plaintiff filed a grievance regarding his June 2015 warning and the issuance of a final written warning.  Plaintiff made a hotline complaint in early July and on July 22 was denied a request for transfer.  One day, or a few weeks, is quite close.  But Plaintiff "must be able to show that the relevant [decisionmakers] were aware of his [protected activity] at the time the alleged retaliation occurred."  *Baqir*, 434 F.3d at 748.  Plaintiff was disciplined by a variety of different decisionmakers after a variety of different complaints, and he provides no evidence that

---

[13] The Court is making *all* inferences in Plaintiff's favor here.  It seems that Plaintiff did have some trouble at work in 2011 and 2013, prior to making any complaints.  Furthermore, the absence of evidence is not evidence of absence.  Neither party has presented the Court with evidence of particular warnings, pursuant to the Union disciplinary process, that were given to Plaintiff between 2005 and 2013, but that does not ineluctably lead to the conclusion that Plaintiff was a model employee during those years.

the decisionmakers were aware of the specific complaints when they made their decisions to discipline him.

Furthermore, Plaintiff does not dispute the reasons for these disciplinary actions. The June 2015 written warning, for example, occurred suspiciously close to Plaintiff's filing of a grievance, a distance of only one day. But that warning stated that on June 24, 2015, Plaintiff performed a job and 100% of the product produced was unusable. Plaintiff does not dispute this. Nor does he dispute that the June 24 job was the fourth incident a month, with a total cost to the company in that month of $13,903.25. Plaintiff cannot rely on temporal proximity to overcome this otherwise reasonable, and undisputed, justification for the adverse action. The same can be said for all of the adverse actions taken against Plaintiff.

Plaintiff does not present evidence from which a reasonable jury could conclude that there was a causal connection between his protected activity and the alleged retaliatory conduct. Accordingly, summary judgment will be granted for the Defendant on Plaintiff's retaliation claims.

### d. *Legitimate Non-Discriminatory Reasons*

Even if the Court were to find that Plaintiff *had* established a *prima facie* case of race discrimination or retaliation, Plaintiff would still be unable to rebut Defendant's legitimate non-discriminatory reasons for the various adverse employment actions it took against him. "Th[e] burden [of proving a legitimate non-discriminatory reason] is one of production, not of persuasion, and it involves no credibility assessment." *Bostron*, 104 F. Supp. 2d at 552. It is the plaintiff who must persuade the Court that the proffered reason is a red herring. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")

At a certain point, the Court's reiteration of Plaintiff's proof problems seems excessive, but the Court will again note that Plaintiff has not rebutted the substance of a single warning that was given to him or a single disciplinary action that was taken against him. For example, Plaintiff does not dispute that Mr. Sewell was the manager who made the decision to terminate Plaintiff, that Mr. Sewell was not aware of Plaintiff's past complaints of discrimination, and that Mr. Sewell's reason for terminating Plaintiff was his poor work performance.

The Court will note here that to the extent Plaintiff claims that Defendant's denials of his requests for transfer or promotion were discriminatory in nature, Plaintiff has not disputed the various legitimate non-discriminatory reasons for these denials. Plaintiff was denied promotion in August 2014 for lack of experience, and he does not dispute that he lacked experience in the position. Defendant denied Plaintiff's request for transfer in April 2015 because Plaintiff applied too late for the transfer; Plaintiff does not dispute that his application was tardy. Defendant denied Plaintiff's request for promotion in May 2015 because it retracted the position; Plaintiff does not dispute that the position was retracted, or provide additional evidence that Defendant retracted the position out of discriminatory animus. Defendant denied Plaintiff's July 2015 request for transfer because there were disciplinary charges pending against Plaintiff; Plaintiff does not dispute that disciplinary charges were pending against him, or provide evidence that this was a pretextual reason for denying him the transfer.

At this stage, Defendant must only produce evidence that it has legitimate non-discriminatory reasons for its actions, and it has done so. Plaintiff bears the burden of providing

evidence and persuading the Court that the proffered reasons are pretextual, and Plaintiff has not met that burden.  *See Burdine*, 450 U.S. at 253.

### e. *Hostile Work Environment*

It is unclear if Plaintiff attempted to bring a hostile work environment claim.  Plaintiff conclusorily alleges that Defendant "subjected Plaintiff to harassment, creating a hostile work environment."  (*See, e.g.*, Compl. ¶¶ 78.)  Defendant addressed the deficiencies in Plaintiff's possible hostile work environment claim in its motion for summary judgment (Mot. Summ. J. Mem. Supp. at 27-28), but Plaintiff did not respond to Defendant's arguments (the words "hostile work environment" do not appear in Plaintiff's opposition).  Thus, it is unclear if Plaintiff attempted to bring this claim, and if he did whether he concedes that it is without merit. Regardless of the lack of clarity in Plaintiff's complaint or argument, the Court will briefly address this claim and note that it fails as a matter of law.

To succeed on a hostile work environment claim, Plaintiff must prove "the existence of harassment that is '(1) unwelcome, (2) because of [race], (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer.'" *James*, 792 F. Supp. 2d at 866 (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008)).  Plaintiff has alleged two instances of harassment, the noose and the note, over the course of a 16-year career.  Even assuming that the hose was tied as a noose in order to harass Plaintiff, and even assuming that the "monkey" note was more than a reminder to clean up the breakroom, these two instances are not sufficiently severe and pervasive so as to alter the conditions of his employment.[14]  Summary judgment will be granted for Defendant on Plaintiff's hostile work environment claim.

---

[14] The Court notes that even single instances of alleged harassment *can* be so severe as to state a claim for hostile work environment.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015).  But the alleged

### IV.    *Conclusion*

Plaintiff has failed to produce evidence from which a reasonable jury could conclude that he presented a prima facie case of race or retaliation discrimination under Title VII, 42 U.S.C. § 1981, or the MFEPA.  Neither has he produced evidence from which a jury could conclude that legitimate non-discriminatory reasons for any adverse employment action were pretextual. Finally, Plaintiff has not presented sufficient evidence from which a jury could conclude that he was subjected to a hostile work environment.  Accordingly, Defendant's motion for summary judgment will be granted, judgement will be entered for the Defendant on all counts, and the Clerk shall be directed to close the case. An order shall issue setting forth this disposition.

DATED this 25th day of June, 2018.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge

---

instances of harassment here are significantly less severe in nature than those in *Boyer-Liberto*, where a supervisor twice referred to the African American plaintiff as a "porch monkey."  Although the break room note refers to "monkeys," Plaintiff does not allege, or state in his deposition or declaration, that he considered the reference to monkeys in the note to be a racial slur (he argues that it was a "racial action").